Docket No. 106805.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE CITY OF CHICAGO, Appellee, v. PROLOGIS *et al.*, Appellants.

*Opinion filed January 22, 2010.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

The circuit court of Cook County denied defendant and intervening petitioners' counterclaim for inverse condemnation. The appellate court affirmed the circuit court's denial of the counterclaim (383 Ill. App. 3d 160), and we granted defendant and intervening petitioners' leave to appeal. 210 Ill. 2d R. 315. For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

In 1996, the Village of Bensenville authorized tax increment allocation financing through the issuance of tax increment financing

(TIF) bonds pursuant to the Tax Increment Allocation Redevelopment Act (65 ILCS 5/11–74.4–1 *et seq.* (West 1996)). Bensenville took this action in order to redevelop land (subject property) bordering O'Hare International Airport, which is owned and operated by plaintiff, the City of Chicago.[1] Bensenville signed a redevelopment agreement with a developer, Hiffman Shaffer Associates Acquisitions (developer), and passed the proper ordinances and resolutions approving the redevelopment agreement. In the redevelopment agreement, the developer agreed to purchase and develop the subject property by constructing an air cargo/warehouse distribution complex. The redevelopment agreement also ratified the developer's assignment of its right to purchase the property to defendant ProLogis, f/k/a Security Capital Industrial Trust, which became both the owner of the property and a holder of one of the TIF bonds. Bensenville agreed to issue TIF bonds to finance TIF-eligible improvements to the subject property. Under the redevelopment agreement, the total cost of the entire project was approximately $52 million, of which only $8.96 million was eligible for TIF financing. Bensenville passed a bond ordinance that provided for the issuance of $7 million worth of TIF bonds and stated that the ordinance constituted a contract between Bensenville and the registered bondholders. Defendant received one 20-year-term TIF bond in the amount of $2.8 million, and the developer's nominees, the interveners,[2] received 11 20-year-term bonds amounting to $4.2 million. The proceeds of the TIF bonds were restricted to TIF-eligible costs.

The 12 TIF bonds issued have different values, but the terms are identical. The TIF bonds have an interest rate of 10% and are exempt

---

[1]Bensenville designated the subject property the "O'Hare Cargo Center Redevelopment Project Area."

[2]Besides defendant ProLogis, the other TIF bond owners are interveners Dennis J. Hiffman, John F. Cash, Sylvia Doyne Collins Irrevocable Trust dated 4/10/96, Keith Bank Declaration of Trust dated 12/14/94, Edward R. Hulina Trust dated 5/10/94, JKS-3D Two Trust, Mark D. Christensen, Holly D. Hulina Trust dated 5/10/94, Elizabeth E. Hulina Trust dated 5/10/94, Bonnie E. Hulina Trust dated 5/10/94, and Richard E. Hulina Trust dated 5/10/94.

from federal income taxes. The bond ordinance outlined the security for the bonds, specifically that Bensenville "pledges the [p]ledged [t]axes." The bond ordinance defines pledged taxes as the incremental property taxes, which it defines as "the ad valorem taxes, if any, arising from the tax levies upon taxable real property *** which taxes are attributable to the increase in the then current equalized assessed valuation *** over and above the total Initial Equalized Assessed Value." The TIF bonds themselves contain an almost identical provision on their face outlining from where the principal, interest, and premium, if any, will be paid.[3] The bond ordinance also states the TIF bonds are "limited obligations" of Bensenville and that they are "payable solely and only from the [p]ledged [t]axes." Further, the bond ordinance states "[n]o holder of any Bond shall have the right to compel the exercise of any taxing power of the Village for payment of principal thereof or interest or premium, if any, thereon." An almost identical provision is stated on the face of the TIF bonds. The bond ordinance also guarantees Bensenville will not act, or fail to act, in any way that would adversely affect the TIF bonds.

In connection with their purchase of the TIF bonds, the bond purchasers signed certificates of purchase. In doing so, the individual bondholders certified it received the proper information regarding the underlying project, including the documents authorizing the bonds, opinion of bond counsel, and all other information that allowed the bondholder "to make an informed investment judgment." Additionally, they certified that they were "aware that any investment involves inherent risks and, as such, the security behind that investment should be fully understood." Further, the certificate of purchase acknowledges that the bondholder:

---

[3]Specifically, the TIF bonds state that "the principal of and interest, and premium, if any, on the Bonds are payable solely from (i) the ad valorem taxes, if any, arising from the taxes levied upon taxable real property in the O'Hare Cargo Center Redevelopment Project Area *** which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract or parcel of real property in the Area over and above the initial equalized assessed value of each such piece of property ***."

-3-

"is a sophisticated investor, can bear the economic risk of the purchase of the Bonds, and has such knowledge and experience in business and financial matters, including the analysis of a participation in the purchase of similar investments, as to be capable of evaluating the merits and risks of an investment in the Bonds."

The certificate of purchase also addresses the security for the bonds. Specifically, it certifies that the holder of the bond "understands that the Bonds are secured solely and only by the Incremental Property Taxes pledged under the Ordinance as security for the Bonds, if, as and when received."

Between 1996 and 2001, Bensenville, the interveners, and defendant, both as owner of the property and as a bondholder, performed their obligations under the bond ordinance and the air cargo/warehouse distribution complex was completed. Defendant leased the buildings in the complex to commercial tenants.[4] Incremental real estate taxes were collected and paid to the bondholders.

In 2002, plaintiff passed an ordinance as part of the O'Hare Modernization Program, which authorized the use of eminent domain to acquire the subject property for the expansion of O'Hare International Airport. In April 2006, plaintiff filed a complaint for condemnation pursuant to article VII of the Illinois Constitution of 1970, sections 11–61–1 and 11–102–4 of the Illinois Municipal Code (65 ILCS 5/11–61–1, 11–102–4 (West 2004)), and the O'Hare Modernization Act (620 ILCS 65/1 et seq. (West 2004)) in order to acquire fee simple title in defendant's property. Plaintiff's condemnation complaint did not include the TIF bonds as property to be acquired in the condemnation proceeding.

In May 2006, interveners, joined by defendant (collectively bondholders), filed a petition to intervene and a counterclaim for inverse condemnation alleging that plaintiff's condemnation of the subject property amounted to an inverse condemnation and a taking requiring payment of just compensation, as well as attorney fees, and costs. The bondholders argued that when plaintiff acquires the subject

---

[4]The lessees of the subject property did not participate in this appeal.

property, it will become tax exempt. Since the TIF bonds are secured only by the real estate tax income derived from the subject property, they will lose all value once the property becomes exempt from taxes.

In August 2006, the circuit court entered an agreed final judgment order, holding plaintiff was authorized to exercise the right of eminent domain and that it exercised that right properly. The order also stated that plaintiff and defendant had agreed on a final amount of just compensation of $94.5 million for fee simple title to the property. This compensation award did not include any compensation award for the bondholders, but it provided that the agreed final judgment order did not affect, in any way, the bondholders' claim to just compensation for the TIF bonds. The parties agreed that the agreed final judgment order did not constitute a waiver of the right to appeal any order concerning the TIF bonds.

In December 2006, the circuit court filed a memorandum decision and judgment order allowing petitioners to intervene, but denying the bondholders' inverse condemnation counterclaim, finding that the bondholders' loss is a consequence of a lawful taking, not a taking separate from the property itself, and, therefore, plaintiff does not owe the bondholders any compensation. The court found the situation unique in that it involved a simultaneous condemnation and inverse condemnation that resulted in a consequential loss. The court stressed that the bondholders certified they are sophisticated investors and that the taking of the property was a consequence and known risk. The court also pointed out that the bondholders admitted in their counterclaim that the rendering of the bonds valueless was an indirect result and consequence of plaintiff's condemnation proceedings.

The appellate court agreed and affirmed the circuit court's decision. 383 Ill. App. 3d at 161. The court concluded that the terms of the bond purchases show that the bondholders were not guaranteed to receive the incremental real estate taxes. 383 Ill. App. 3d at 169. The bondholders were only to be paid by the incremental taxes, "if any." 383 Ill. App. 3d at 169-70. The court held it was clear that the bondholders had notice that due to any number of circumstances, there was the possibility that they would not receive payment. 383 Ill. App. 3d at 169-70. The court concluded that the TIF bonds' loss in value was a consequence of a lawful taking, and that since the TIF bonds were not secured by the real property, plaintiffs were not

required to pay the bondholders just compensation. 383 Ill. App. 3d at 171-72.

ANALYSIS

The bondholders assert that the TIF bonds' loss in value after plaintiff's condemnation action was not a consequential taking, but a property interest that requires just compensation. They contend that both the circuit court and the appellate court erred by relying on the cases of *Omnia Commercial Co. v. United States*, 261 U.S. 502, 67 L. Ed. 773, 43 S. Ct. 437 (1923), and *John K. & Catherine S. Mullen Benevolent Corp. v. United States*, 290 U.S. 89, 78 L. Ed. 192, 54 S. Ct. 38 (1933). They further maintain that two federal district court cases from Oregon, *United States v. Aho*, 68 F. Supp. 358 (D. Or. 1944), and *United States v. Florea*, 68 F. Supp. 367 (D. Or. 1945), properly decide the issue before us. We disagree.

Determining whether there has been an actionable taking is a question of law. *Department of Public Works & Buildings v. Wilson & Company, Inc.*, 62 Ill. 2d 131, 141 (1975). Thus our review is *de novo*. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998). In a claim for inverse condemnation, as opposed to an eminent domain action, the property owner seeks compensation for a taking of private property where a condemnation proceeding has not been initiated. *Byron Dragway, Inc. v. County of Ogle*, 326 Ill. App. 3d 70, 73 (2001). As discussed by the circuit court, this case presents a unique situation: a condemnation proceeding was initiated by plaintiff, but plaintiff's condemnation complaint did not include allegations that the TIF bonds were property that required just compensation. At issue is whether the holders of TIF bonds, although the TIF bonds are secured solely by the possibility of incremental real estate taxes, are due just compensation for the TIF bonds' loss of value, or whether the TIF bonds' loss in value, due to plaintiff's condemnation proceeding, is a consequence of a lawful taking, and, thus, not eligible for just compensation.

Authority prohibiting the taking of private property for public use without paying just compensation is found in both the Illinois and United States Constitutions. Specifically, the fifth amendment to the United States Constitution, made applicable to the states through the

fourteenth amendment, provides that private property shall not "be taken for public use, without just compensation." U.S. Const., amend. V. The Illinois Constitution of 1970 states: "Private property shall not be taken or damaged for public use without just compensation ***." Ill. Const. 1970, art. I, §15. Private property includes "every kind and character, whether real, personal, tangible, or intangible." *Illinois Cities Water Co. v. City of Mt. Vernon*, 11 Ill. 2d 547, 550-51 (1957).

In *Omnia*, owners of a potentially lucrative contract to the rights to purchase steel plate below market value from Allegheny Steel Company sought just compensation from the federal government. *Omnia*, 261 U.S. at 507-08, 67 L. Ed. at 775, 43 S. Ct. at 437. Before the owners of the contract exercised their right to purchase the steel plate, the federal government requisitioned Alleghany Steel Company's supply of steel plate for an entire year and ordered the company not to comply with the owners' contract to purchase steel plate below market value. *Omnia*, 261 U.S. at 507, 67 L. Ed. at 775, 43 S. Ct. at 437. The United States Supreme Court held that where loss or injury are the consequences of a lawful government action, the government does not owe just compensation. *Omnia*, 261 U.S. at 510, 67 L. Ed. at 776, 43 S. Ct. at 438. The Supreme Court stressed that the federal government did not keep the contract for its own use. *Omnia*, 261 U.S. at 513, 67 L. Ed. at 777, 43 S. Ct. at 439. Rather, the contract was ended as a consequence of the federal government's requisition. *Omnia*, 261 U.S. at 513, 67 L. Ed. at 777, 43 S. Ct. at 439. The Supreme Court held, "If, under any power, a contract or other property is taken for public use, the Government is liable; but if injured or destroyed by lawful action, without a taking, the Government is not liable." *Omnia*, 261 U.S. at 510, 67 L. Ed. at 776, 43 S. Ct. at 438.

In *Mullen*, the Supreme Court addressed a factually similar situation to the one before us here. *Mullen*, 290 U.S. at 90, 78 L. Ed. at 193, 54 S. Ct. at 39. In *Mullen*, a village government issued bonds to finance infrastructure improvements and authorized assessments to pay the principal and interest of the bonds. *Mullen*, 290 U.S. at 90, 78 L. Ed. at 193, 54 S. Ct. at 39. The federal government subsequently acquired the land from which the assessments were made, paying all the existing assessments to the property. *Mullen*, 290 U.S. at 91, 78 L. Ed. at 194, 54 S. Ct. at 39. The bonds, however, were not fully

paid. *Mullen*, 290 U.S. at 91, 78 L. Ed. at 194, 54 S. Ct. at 39. The statute authorizing the bonds allowed for reassessment of the property in order to pay the outstanding bonds, which the village was to collect and place in a separate fund to pay the bonds. *Mullen*, 290 U.S. at 93, 78 L. Ed. at 195, 54 S. Ct. at 40. The reassessment was done after the federal government acquired the property, but since it was then owned by the federal government, the assessment was a nullity. *Mullen*, 290 U.S. at 91, 78 L. Ed. at 194, 54 S. Ct. at 39. The Supreme Court denied the bondholders compensation, holding the bonds were not taken and "at most frustrated action by the city to replenish the assessment fund to which alone the bondholder must look for payment of his bonds." *Mullen*, 290 U.S. at 94-95, 78 L. Ed. at 195-96, 54 S. Ct. at 40.

In this case, plaintiff lawfully condemned land in order to expand O'Hare International Airport according to the O'Hare Modernization Act (620 ILCS 65/1 *et seq.* (West 2004)). The legality of plaintiff's condemnation of the fee simple interest in the subject property has not been questioned. One of the bondholders, defendant ProLogis, was even part of the agreed final judgment order that authorized plaintiff's right to eminent domain and stated that plaintiff had exercised that right properly. As in *Omnia*, where the federal government did not take the contract at issue for its own use, here plaintiff did not take the TIF bonds, which are still the property of the bondholders. Similar to *Mullen*, where the federal government "frustrated" the bond payment fund, the only source of payment for the TIF bonds in this case was from the incremental taxes and only if any were generated. A consequence of plaintiff's subsequent ownership of the subject property was the termination of the generation of incremental taxes. The destruction of the value of the TIF bonds was a consequence of plaintiff's lawful action and, thus, as case law makes clear, plaintiff does not have to pay just compensation for the TIF bonds' loss in value.

Similar to the contract in both *Omnia* and the bonds in *Mullen*, the destruction of the TIF bonds' value was an indirect consequence of a lawful government action. We therefore agree with both the circuit court and the appellate court that *Omnia* and *Mullen* control this case. Moreover, we believe that bondholders' reliance on the two district court cases, *Aho* and *Florea*, is misplaced. *Aho* and *Florea* involved

the federal government condemning land in drainage districts in Oregon. *Aho*, 68 F. Supp. at 358; *Florea*, 68 F. Supp. at 367. In both cases, the federal district court ruled the federal government had to pay future assessments that acted as an encumbrance on the condemned land. *Aho*, 68 F. Supp. at 366; *Florea*, 68 F. Supp. at 376. In the case before us, the only security the bondholders had was the right to the incremental taxes, if any, which did not encumber the subject property. The security for the bonds is outlined in the bond ordinance and in the TIF bonds themselves. Additionally, each bondholder signed the certificate of purchase and, in doing so, confirmed they understood what secured the TIF bonds.

The bondholders, in their brief, specifically argue that the Illinois takings clause provides them greater protection than the federal takings clause provides. However, bondholders did not raise this issue in their petition for leave to appeal. In *Dineen v. City of Chicago*, this court recognized that the forfeiture rule is not jurisdictional, and thus does not prevent a court of review from considering an issue not raised in a petition for leave to appeal. *Dineen v. City of Chicago*, 125 Ill. 2d 248, 265-66 (1988). Rather, the forfeiture rule is discretionary, and in certain specific circumstances, a court may review a claim even when it was not included in the petition for leave to appeal. *Dineen*, 125 Ill. 2d at 265-66. None of the circumstances outlined in *Dineen* are present in this case, and for that reason we will not consider this issue. *Dineen*, 125 Ill. 2d at 265-66.

Finally, bondholders advance several other arguments that are unpersuasive. They assert that the TIF bonds' rights to the incremental taxes are secured by the municipal ordinances and tax lien jurisprudence. This directly contradicts the agreements to purchase the TIF bonds to which the bondholders were parties. As stressed in the bond ordinance, the TIF bonds, and the certificate of purchase signed by each of the bondholders, the only security for payment of the TIF bonds was the incremental taxes, if any. The bondholders fail to offer any authority stating that the municipal ordinances act as security for the TIF bonds. The bond ordinance is clear in that it operates as a contract between Bensenville and the purchasers of the TIF bonds. It does not bind plaintiff. Additionally, bondholders do not cite any authority to show how their right under the TIF bonds to the incremental taxes translates into a tax lien that demands the payment

of just compensation. The bond ordinance is clear that the bondholders cannot compel Bensenville to tax the subject property. Accordingly, we are unpersuaded by bondholders' contention that various municipal ordinances or tax lien jurisprudence in Illinois operates as security for the TIF bonds.

Bondholders also disagree with the appellate court's decision that the holders of the TIF bonds assumed the risk of a possible condemnation. We find this argument without merit because it is directly contradicted by the certificate of purchase each bondholder signed. In the certificate of purchase, the bondholders certified that they were informed of their purchase, were aware that there were "inherent risks," and that they understood the terms. The certificate described, and the bondholders ratified, that they were "sophisticated investor[s]" who were capable of evaluating the risks of investing in the TIF bonds. Additionally, the certificate of purchase stated that the bondholders knew and understood that the only security for the TIF bonds was the incremental property taxes, "if, as and when received." As plaintiff states in its brief, the City of Chicago has previously condemned land in other municipalities for the expansion of O'Hare International Airport.[5] Although the bondholders may not have known of this particular airport expansion, it is not unheard of that O'Hare International Airport may expand. Since the subject property borders the airport, an investor could reasonably foresee that the subject property is vulnerable to future airport expansion.

This case clearly falls within the parameters of both *Omnia* and *Mullen*. The right of the bondholders to the incremental taxes, if any, generated by the subject property, and the subsequent loss of value of that right, is due to a lawful government action by the plaintiff and, therefore, plaintiff does not have to pay bondholders compensation for the lost value of the TIF bonds.

## CONCLUSION

The judgment of the appellate court is affirmed.

---

[5]See *Village of Schiller Park v. City of Chicago*, 26 Ill. 2d 278 (1962).

*Affirmed.*

JUSTICE BURKE took no part in the consideration or decision of this case.